UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

T&M SOLAR AND AIR CONDITIONING, INC., et al.,

         Plaintiffs,

    v.

LENNOX INTERNATIONAL INC.,

        Defendant.

Case No.  14-cv-05318-JSC

**ORDER RE:  MOTIONS TO DISMISS**

Re: Dkt. Nos. 25, 26

Plaintiffs T&M Solar and Air Conditioning Inc. ("T&M"), Jeremy and Sabrina Newberry ("the Newberrys"), and Andrew and Maitho Hayzel Chan ("the Chans," and collectively, "Plaintiffs") seek to recover damages from Defendant Lennox International ("Defendant") in connection with Plaintiffs' purchase of solar panels from Defendant.[1]  Specifically, Plaintiffs allege that they purchased Defendant's solar panels because they were marketed to work through air conditioning systems, rather than through electrical panels, but they were unable to install the solar panels through their air conditioning systems as promised.  In the four-count First Amended Complaint ("FAC"), Plaintiffs contend that Defendant's conduct constitutes breach of contract between T&M and Defendant, and breach of implied contract, breach of warranties, and fraud as to all Plaintiffs.  (Dkt. No. 16 ¶¶ 30-67.)

    Now pending before the Court are Defendant's two motions to dismiss.  Defendant contends that T&M's claims must be dismissed or transferred due to improper venue, and that all

---

[1] Plaintiff also sues a number of Doe defendants believed to be agent and employees of Lennox. (*See* Dkt. No. 16 ¶¶ 6-7.)

of Plaintiffs' causes of action—save T&M's breach of contract claim—must be dismissed for failure to state a claim. After carefully considering the parties' submissions, and having had the benefit of oral argument on March 19, 2015, the Court DEFERS determination of Defendant's venue motion pending an evidentiary hearing regarding the existence of a forum selection clause and GRANTS IN PART Defendant's 12(b)(6) motions for failure to state a claim.

BACKGROUND

**A.     FAC Allegations**

*The Relationships Among the Parties*

T&M is a California corporation with its principal place of business in Escondido, California that does business in Contra Costa County. (Dkt. No. 16 ¶ 1.) Mark Mattson, a duly licensed contractor, is T&M's owner and operator. (*Id.*) T&M conducts business installing solar, heating, and air conditioning systems in both commercial and residential buildings. (*Id.* ¶ 5.) Plaintiffs Jeremy and Sabrina Newberry are husband and wife residing in Contra Costa County. (*Id.* ¶ 2.) Plaintiff Andrew and Maitho Hayzel Chan are husband and wife residing in San Diego County, California. (*Id.* ¶ 3.) The Newberrys and the Chans are T&M customers. (*Id.* ¶ 5.) Defendant Lennox is incorporated and headquartered in Texas and does business in Contra Costa County, California. (*Id.* ¶ 4.)

T&M began working with Defendant in July of 2013. (*Id.* ¶ 9.) T&M submitted orders to Defendant for Defendant's solar panel systems—the Enphase SunSource home and commercial energy systems (the "systems"). (*Id.* ¶ 9.) T&M purchased Defendant's systems because, unlike traditional solar panel systems, Defendant's products were the only systems available at the time of purchase that were created to run electrical systems through heating, ventilating, and air conditioning systems ("HVAC"), rather than through an electrical panel. (*Id.*) Representatives of Defendant assured T&M that their systems would function properly and legally in California. (*Id.*) To legally install and operate the systems in California, they must pass both the National Electric Code and local state codes. (*Id.* ¶ 10.) Defendant had a duty to provide systems that pass

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the National Electric Code, while T&M had a duty to ensure compliance with state codes. (*Id.*) Defendant made multiple representations to T&M that the systems would operate as advertised and pass the National Electric Code requirements. (*Id.* ¶ 11.) With respect to state electric code, Defendant told T&M that a company in Sacramento used the systems. (*Id.*)

Based on those representations, T&M sought customers to purchase the systems and Defendant sent representatives to California to advertise the systems to potential clients. (*Id.*) Specifically, T&M ordered and paid for solar panel systems for six clients at six different properties. (*Id.* ¶ 12.) T&M purchased these six systems precisely because Defendant's systems could operate through the six clients' HVAC, which meant that T&M would not have to modify and change the properties' electrical panels—work that would have been required with traditional solar panels. (*Id.*)

*Plaintiffs' Purchases of Defendant's Solar Panel Systems*

Ray Martinez was one of the six clients for whom T&M ordered and purchased a home system from Defendants. (*Id.* ¶ 15.) When his system could not operate or be installed as promised, Ray Martinez demanded a 100 percent refund from T&M. (*Id.*) T&M also had to install and remove Ray Martinez's home system at T&M's own cost. (*Id.*)

T&M also ordered a home system for a client named Shuman.[2] (*Id.* ¶ 16.) Because Shuman's system could not be installed or operate as promised, T&M—at its own cost—removed the system, roof tile, and sheeting to run wiring to Shuman's main electric panel so that his system could function as a traditional solar panel. (*Id.*) Defendant sent two representatives—Stu Quinn and Tom Dowing—to attempt to resolve the situation with Shuman's system. (*Id.*) Defendant paid for a paint job on Shuman's home where the system was installed and gave him a $10,000 credit towards the purchase of his system. (*Id.*)

T&M ordered another home system for a client named Green, who agreed to purchase a

---

[2] The FAC does not provide a first name for this customer.

3

home system after Defendant's representative, agent, or employee, Peter Martinez, drove from Chicago in a van with a sample home system inside.[3]  (*Id.* ¶ 17.)  Peter Martinez made representations to Green "guaranteeing the product in advance" and represented to him that Defendant and T&M were a partnership and that if the product failed to work properly, Defendant—not T&M—would be responsible.  (*Id.*)  T&M installed Green's home system, "and while it works, it cannot be used"; "[o]nly the air conditioner portion of the system is operable." (*Id.*)

T&M also purchased a home system for the Newberrys.  (*Id.* ¶ 18.)  Peter Martinez—the Lennox representative who drove the van with a sample system inside—traveled to the Newberrys' home in Brentwood, California and inspected their roof to determine whether the home system could be installed there.  (*Id.*)  Jeremy Newberry was not home at the time, but Martinez called Newberry to inform him that the home system could be installed and to guarantee the system's success.  (*Id.*)  As with Green, Martinez represented to the Newberrys that Defendant "stood by their product 100%," but that if it failed to work properly Defendant and T&M were a partnership and Defendant—not T&M—would be responsible.  (*Id.*)  Stu Quinn also made representations to the Newberrys about the home system.  (*See id.*)  Based on Defendant's representations, the Newberrys decided to order a home system consisting of 200 solar panels—in particular, "because the electrical panel they had in place at their home was already maxed out and therefore a traditional solar panel system would not work unless [they] upgraded their electrical panel."  (*Id.* ¶ 19.)  T&M was not able to install the home system successfully at the Newberrys' home, however, because the system failed to meet National Electric Code requirements.  (*Id.*)

Upon learning that the Newberrys' system was inoperable, Defendant sent a representative, Stu Quinn, to meet with them.  (*Id.* ¶ 20.)  Quinn initially told the Newberrys that he would have "several options and/or solutions to the problem" with the system, but when he arrived at their house he told them that the only option "was to jack hammer all of the concrete around his pool

---

[3] The FAC does not provide a first name for this customer.

and update his electric panel to have the [home system] installed to operate as a traditional solar panel system and not through HVAC[.]" (*Id.*) Tearing up the concrete, however, was not an option for the Newberrys, who run a business at their residence using it as a venue for weddings and other formal events. (*Id.*) Quinn informed the Newberrys that Defendant would give them $60,000, but neither Quinn nor Defendant did so. (*Id.*) As a result of the issues with the Newberrys' home system, T&M had to install a large air conditioning unit on their property, "and it is an eyesore." (*Id.*)

Peter Martinez also brought his van with its sample system to the Chans, and made a presentation to them about the system. (*Id.* ¶¶ 21-22.) The Chans agreed to purchase a commercial system after Martinez guaranteed the system, said that Defendant "stood by their product 100%[,]" and represented that if the system failed to work, Defendant would be responsible for it. (*Id.*) The Chans authorized T&M to order and purchase a commercial system for Andrew Chan's new dental office, where he planned to establish a new dental practice where he could see six patients at a time. (*Id.* ¶ 22.) Before placing the order, representatives from Defendant and T&M visited the property to verify that the commercial system would work there. (*Id.*) T&M completed a two-page inspection form that Defendant provided regarding the condition of the building, the roof, the current air conditioning units in place, and a test of the available voltage. (*Id.*) Defendant then uses this form to specify which equipment to sell to the Chans. The form also asks "if local codes were checked and T&M verified this information for [Defendant], however T&M was never given any wiring schematics from [Defendant]." (*Id.*) In the form, Defendant listed their equipment as approved and meeting all National Electric Code requirements. (*Id.*)

Once the Chans placed their order, they learned that there would be an eight-week delay in delivering the system. (*Id.* ¶ 23.) While they waited for the system to arrive, T&M made significant changes to the roof and structure of the Chans' dental office property to accommodate the soon-to-arrive commercial system, including removing current air conditioners and removing

United States District Court
Northern District of California

the roof to install mounting brackets for the panels in the new system.  (*Id.*)  However, when the Chans' system arrived, it could not be installed because it failed to pass the National Electric Code.  (*Id.* ¶ 24.)  Essentially, this left the Chans paying for dental office space without air conditioning, making it uninhabitable.  (*Id.*)  In addition, Andrew Chan has not been able to open his six-seat dental practice, and instead has been renting a single dental chair in a chiropractor's office.  (*Id.*)  The Chans have also had to acquire and extend building permits for the dental office. (*Id.*)

Defendant's representatives told the Chans that Defendant would take full responsibility for the failed system and would compensate the Chans for their losses.  (*Id.* ¶ 25.)  Specifically, in December 2013 Defendant contacted the Chans and had them submit a claim; they calculated their losses to be around $200.000.  (*Id.*)  The Chans submitted the claim, but Defendant never paid. (*Id.*)

**B.    Venue Evidence**

In support of its motion to transfer venue, Defendant submits two declarations of Mary Engebretsen, custodian of records for Lennox.  (Dkt. Nos. 20, 32.)  Engebretsen asserts that T&M completed a credit application with Defendant on February 10, 2013 ("February Credit Application").  (*Id.* at ¶ 4 & Ex. A.)  Takayuki Yoshihama, general partner of T&M, signed the February Credit Application.  (*Id.*)  Defendant approved T&M's application on February 25, 2013 and opened an account for T&M to do business with Defendant.  (*Id.* ¶ 5 & Ex. B.)

According to Engebretsen, in October 2013, T&M requested that Defendant change the name on its account (from T&M Heating to T&M Solar and Air Conditioning).  (*Id.* ¶ 6 & Ex. C.) On October 3, 2013, T&M executed a second credit application ("October Credit Application") in order to effect the name change in Defendant's accounts.  (*Id.*)

Engebretsen avers that both the February and October 2013 Credit Applications included the same page titled "Terms and Conditions of Sale" (the "Terms").  (*Id.* ¶ 7.)  Specifically, she asserts, the Terms attached to the both credit applications provide in relevant part that:

United States District Court
Northern District of California

> Seller and Purchaser agree that any suit or other legal action brought by either party against the other arising as a result of the account and/or business relationship between Seller and Purchaser **shall be brought in a Court of competent jurisdiction located in Dallas County, Texas**.

(*Id.* at Ex. D (emphasis added).)

In response, T&M has submitted two declarations of its owner, Mark Mattson.[4] (Dkt. Nos. 29, 42-1.) According to Mattson, Defendant told T&M that the Credit Applications were mere formalities and that none of Defendant's representatives ever "presented" or "went over" the Terms with him or Yoshihama. (*Id.* at 2-3.) Moreover, Mattson avers that neither he nor Yoshihama ever saw or heard of the Terms until January 2015 during the course of this litigation. (*See id.* at 2.) In fact, in his initial declaration, Mattson states that he found in his records a different terms sheet from Defendant, which includes a different venue provision. (*Id.* at 3 & Ex. A.) That terms sheet provides that:

> Purchaser waives any and all privileges and rights, which Purchaser may have relating to venue. Purchaser and Seller agree that any legal action brought by either as a result of the account or business relationship between Purchaser and Seller **shall be brought in the venue of the state where the sales from Seller to Purchaser occurred**.

(*Id.* at Ex. A (emphasis added).) In other words, the Terms sheet Mattson identifies provided that venue lies at the "point of sale."

Mattson's supplemental declaration provides more detail. There, he states that T&M actually signed three different credit applications: one in February 2013, one in October of 2013,

---

[4] Both of Mattson's declarations discuss far more than the existence of the credit application; instead, Plaintiffs submit his declarations "for the purposes of clarifying the facts surrounding the relationship between Plaintiffs and Defendant in this case." (Dkt. No. 29 at 1.) The Mattson Declaration provides further details about Defendant's activities in California and other facts that provide further color to the allegations in the FAC. (*See, e.g.*, *id.* at 2 ("Peter [Martinez] drove a SunSource truck from Chicago [ ] to Escondido, Ca."); *id.* at 3 (providing further details about the ordering process); *id.* at 4-5 (describing Defendant's promises to reimburse T&M and the individual Plaintiffs); *see also* Dkt. No. 42-1 at 2 ("Dr. Chan asked Peter what happens if the system fails . . . [and] Peter [Martinez said] that it was Lennox who you are buying the system from and Lennox stands behind the entire system.").) The Court will consider the declarations solely insofar as they pertain to the credit application and forum selection clauses at issue.

and one "approximately one month" after that.  (Dkt. No. 42-1 at 1-2.)  Mattson clarifies that the February 2013 application "was only one page and it did not have a forum clause on it anywhere and that was never corrected[.]"  (*Id.* at 1.)   In October 2013, T&M received a second credit application.  (*Id.* at 2.)  This application was two pages long; the second page contained the point-of-sale venue language, not the Texas forum selection clause that Defendant urges.  (*Id.*)  Finally, Mattson explains, T&M filled out a third credit application about one month later because "[t]here was another company with the same name T&M Solar in [the] area," and this application "also consisted of two pages and the second page had a [venue provision] that was point of sale as well."  (*Id.*)  In other words, Mattson avers that none of the three credit applications T&M signed contained the Texas forum selection clause that Defendant identifies.  Mattson also notes that "[a]ll of the property for the [Individual Plaintiffs] involved in this case was ordered[, so the sale was concluded], before Lennox sent the October 2013 credit application."  (*Id.* at 2.)

On the eve of the motion hearing, T&M submitted a third declaration from one of Defendant's former employees, Stuart Quinn.  (Dkt. No. 44.)  Quinn, who served as Commercial District Manager for Defendant in California, among other places, asserts that he signed both of the T&M credit applications on Defendant's behalf.  (*Id.* ¶¶ 2-3.)  Quinn largely echoes Mattson's recollection of events—although Quinn contends that there were two applications, not three—and states that the February 2013 credit application did not contain a second page with Terms and Conditions of Sale, and the October 2013 credit application did include a second page, which contained the point-of-sale clause that Mattson identified.  (*Id.* ¶ 4.)  Quinn further states that "[d]uring [his] years with [Defendant], the only forum clause [he had] seen was a point of sale clause."  (*Id.*)

### C.    Procedural History

Plaintiffs initiated this action on October 27, 2014 in Contra Costa County Superior Court.  (*See* Dkt. No. 1 ¶ 1.)  Defendant timely removed the case to federal court, then filed motions to dismiss the claims of both T&M and the individual Plaintiffs.  (Dkt. Nos. 4, 8.)  All parties have

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

consented to the jurisdiction of a magistrate judge.  (*See* Dkt. Nos. 11, 15.)  Plaintiff then filed the instant FAC, which alleges four causes of action.

In the first cause of action, T&M alleges that Defendant breached their contract for the sale of the systems.  (Dkt. No. 16 ¶¶ 30-39.)  T&M alleges that it entered into a contract for the sale of the systems in July of 2013 based on Defendant's representations that the systems would pass the National Electric Code and that a business in Sacramento was already using the commercial system.  (*Id.* ¶ 32.)  In sales pamphlets and Product Specification packets, Defendant assured consumers that its systems ran through the HVAC and, unlike traditional solar panel systems, Defendant's systems would not require any additional installation or wiring of electrical panels.  (*Id.* ¶ 33.)  T&M alleges that Defendant breached the sales contract because the systems cannot be operated through HVAC since they do not pass National Electric Code requirements.  (*Id.* ¶ 36.)  As a result of Defendant's breach, T&M seeks economic damages of at least $25,000.00 including the cost of installing, removing, and/or replacing the systems, loss of earnings, and loss of business or employment opportunities.  (*Id.* ¶¶ 38-39.)  T&M also seeks non-economic damages, but does not specific what those are.  (*Id.* ¶ 39.)

In the second cause of action, T&M and the Individual Plaintiffs allege that Defendant breached an "implied contract based upon a mutual understanding and expectations between the [ ] parties that the Defendant would provide [solar panel] systems that would pass the [National Electric Code] requirements and operate as designed, advertised, and sold."  (*Id.* ¶ 41.)  In this cause of action, Plaintiffs note that the Individual Plaintiffs only agreed to purchase the systems after Defendant's representatives, agents, and employees visited their properties and assured them that the systems would work and be able to be installed and operated in California as advertised, but breached that implied contract when the systems were unable to operate in California pursuant to the National Electric Code.  (*Id.* ¶¶ 42-43.)  In addition, Plaintiffs contend that Defendant further breached their implied contract by providing assurances to the Individual Plaintiffs that Defendant would either correct the problem to allow the system to function properly pursuant to

United States District Court
Northern District of California

National Electric Code requirements or compensate the Individual Plaintiffs for their losses, but failed to follow through on either offer.  (*Id.* ¶ 45.)  As a result of this breach, T&M sustained economic damages including the cost of installing, removing, and/or replacing the systems, loss of earnings, and loss of business or employment opportunities.  (*Id.* ¶ 47.)  The Individual Plaintiffs also allege damages as a result of this breach:  the Newberrys lost the cost of the home system they purchased but cannot use (*id.* ¶ 48); and the Chans suffered the lost cost of the commercial system they purchased but cannot use as well as construction, installation, removal and/or replacement expenses, lost earnings, lost business or employment opportunities, costs of building permits and renewal for such permits, and the loss associated with inability to operate their business because of the lack of air conditioning.  (*Id.* ¶ 49.)  In addition, Plaintiffs seek non-economic damages, but do not specify what kind.  (*Id.* ¶ 40.)

In the third cause of action, Plaintiffs contend that Defendant breached both express and implied warranties about the systems.  (*Id.* ¶¶ 51-56.)  First, Plaintiffs contend that Defendant made express warranties in written materials and during presentations to the Individual Plaintiffs that the systems "would not have any issues," that Defendant "stood by their product 100% and that if there were any issues that [Defendant] would take full responsibility[,]" and that the systems were approved and met all National Electric Code requirements.  (*Id.* ¶¶ 54-55.)  Plaintiffs chose to purchase the systems based on these representations, only to learn that Defendant's representations about the systems were wrong.  (*Id.* ¶ 55.)  In addition, Plaintiffs allege that Defendant was "subject to the legally-imposed implied warranties of merchantability and fitness for particular purpose."  (*Id.* ¶ 52.)  As a result of breaching these warranties, Plaintiffs seek economic and non-economic damages, though they do not provide further detail.  (*Id.* ¶ 56.)

Finally, in the fourth cause of action Plaintiffs allege that Defendant engaged in fraud.  (*Id.* ¶¶ 57-67.)  Plaintiffs allege that Defendant had a duty to manufacture, sell, and repair systems that passed the National Electric Code requirements and that could be installed and operate as advertised and sold.  (*Id.* ¶ 58.)  Plaintiffs identify the following statements as intentional

United States District Court
Northern District of California

misrepresentations: (1) that Defendant would repair the systems in a timely and appropriate manner in the event that they did not; (2) that Defendant would provide engineered, stamped plans for the systems; (3) that the systems were National Electric Code-approved; (4) that the systems were currently operating at a business in Sacramento; (5) that the systems were operable; and (6) that Defendant would reimburse Plaintiffs for the product or cause it to operate as promised and pass National Electric Code requirements. (*Id.* ¶¶ 59-64.) Specifically, the Individual Plaintiffs relied on information that Peter Martinez and Stu Quinn presented to them prior to purchasing the equipment and in meetings thereafter, and T&M relied on Defendant's statements that the systems were National Electric Code compliant. (*Id.* ¶ 65.) As a result of Defendant's fraud, Plaintiffs seek economic, punitive, and non-economic damages, though they do not provide further detail. (*Id.* ¶ 37.)

Upon the filing of the FAC, Defendant moved to dismiss the claims of both T&M and the Individual Plaintiffs. (Dkt. Nos. 25, 26.) Defendant seeks to dismiss T&M's claims for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3), or transfer them to the Northern District of Texas pursuant to 28 U.S.C. § 1406(a), on the grounds that the forum selection clause in T&M's credit application mandates that all litigation between T&M and Defendant occur in Dallas County, Texas. (Dkt. No. 19 at 9-10.) The Court ordered the parties to submit supplemental briefing on the relevant legal standard governing venue transfers grounded in forum selection clauses (*see* Dkt. No. 41), and the parties did so. (Dkt. Nos. 42, 43.) In addition, Defendant seeks to dismiss all of Plaintiffs' causes of action—those that T&M alleges and those that the Individual Plaintiffs bring—for failure to state a claim upon which relief may be granted. (*Id.* at 11-22; Dkt. No. 23 at 8-19.) The Court held a hearing on the motions on March 19, 2015.

## DISCUSSION

The Court will first address whether T&M's claims have been raised in the proper venue before turning to the sufficiency of the causes of action that all Plaintiffs allege.

1

2
   **I.**      **Venue**

3
       A.    <u>What Legal Standard Governs</u>

4
      Pursuant to Federal Rule of Civil Procedure 12(b)(3), a defendant may move to dismiss a

5
case for improper venue.  Venue is generally proper in a district where, among other things, "a

6
substantial part of the events . . . giving rise to the claim occurred" and where the defendant

7
corporation does business.  28 U.S.C. § 1391(b)(2), (c).  However, as the Supreme Court recently

8
explained in *Atlantic Marine Construction Co. v. United States District Court*, 134 S. Ct. 568

9
(2013),

10
> [w]hen venue is challenged, the court must determine whether the
> case falls within one of the three categories set out in [28 U.S.C.
11
> §] 1391(b).   If it does, venue is proper; if it does not, venue is
> improper,  and  the  case  must  be  dismissed  or  transferred
12
> under § 1406(a).   Whether the parties entered into a contract
> containing a forum-selection clause has no bearing on whether a
13
> case falls into one of the categories of cases listed in § 1391(b).  As
> a result, a case filed in a district that falls within § 1391 may not be
14
> dismissed under § 1406(a) or Rule 12(b)(3).

15
*Id.*  Thus, Rule 12(b)(3) is "not [the] proper mechanism[ ] to enforce a forum-selection clause[;]"

16
rather, "[Section] 1404(a) and the *forum non conveniens* doctrine provide appropriate enforcement

17
mechanisms."  *Id.*; *see also Niburutech Ltd. V. Jang*, --- F. Supp. 3d ----, No. C 14-3091 PJH,

18
2014 WL 6790031, at *1 (N.D. Cal. Dec. 2, 2014) (same); *see, e.g.*, *Monastiero v. appMobi, Inc.*,

19
15 F. Supp. 3d 956, 959-60 (N.D. Cal. 2014); *Marcotte v. Micros Systs., Inc.*, No. C-14-01372 LB,

20
2014 WL 4477349, at *5-6 (N.D. Cal. Sept. 11, 2014).

21
      Section 1404(a) provides a mechanism for enforcement of a forum selection clause and "a

22
proper application of § 1404(a) requires that a [valid] forum-selection clause be given controlling

23
weight in all but the most exceptional cases."  *Atl. Mar. Constr. Co.*, 134 S. Ct. at 579 (internal

24
quotation marks omitted).  In other words, where there is a valid forum selection clause in a

25
contract between the parties, "the interest of justice" is best served by giving effect to the parties'

26
bargain.  *Id.* at 581.  The Supreme Court recognized that "[its] analysis presupposes a

27
contractually valid forum[ ]selection clause."  *Id.* at 579 & n.5.  In the Ninth Circuit, "[a] forum

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

selection clause is presumptively valid; the party seeking to avoid a forum selection clause bears a 'heavy burden' to establish a ground upon which [the court] will conclude the clause is unenforceable." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009).  Thus, if there is a valid forum selection clause, then the Plaintiff bears the burden of showing exceptional circumstances unrelated to the convenience of the parties that make transfer inappropriate. *Atl. Mar. Constr. Co.*, 134 S. Ct. at 581; *see also Rowen v. Soundview Commc'ns, Inc.*, No. 14-cv-05530-WHO, 2015 WL 899294, at *3 (citations omitted); *Bayol v. Zipcar, Inc.*, No. 14-cv-02483-THE, 2014 WL 4793935, at *1 (N.D. Cal. Sept. 25, 2014).

With respect to the validity of the provision, "[a] forum selection clause is presumptively valid[,]" but "is unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought[.]" *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009) (internal quotation marks and citation omitted).  "Courts in the Ninth Circuit have generally agreed that the choice-of-law analysis is irrelevant to determining if the enforcement of a forum selection clause contravenes a strong public policy." *Rowen*, 2015 WL 899284, at *4 (citation omitted).  "Instead, absent a total foreclosure of remedy in the transferee forum, courts tether their policy analysis to the forum selection clause itself, finding the forum selection clause unreasonable only when it contravenes a policy specifically related to venue." *Id.* (citations omitted); *see, e.g.*, *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 497-98 (9th Cir. 2000) (finding a forum selection clause invalid because California law specifically provided that California franchisees were entitled to a California venue for franchise agreement suits).  Thus, unless a plaintiff can demonstrate that her remedy is altogether foreclosed and unavailable in the transferee court, courts do not consider policy arguments unrelated to venue. *See Rowen*, 2015 WL 899294, at *4 (collecting cases); *see also Hegwer v. Am. Hearing & Assocs.*, No. C 11-04942 SBA, 2012 WL 629145, at *3 (N.D. Cal. Feb. 27, 2012) (rejecting plaintiff's argument against transferring venue because plaintiff failed to identify a specific California policy and concluding that any such policy must be related to the forum selection clause itself given that no foreclosure of remedy would exist

1

2    in the transferee forum).

3          Here, the sole basis on which Defendant seeks to transfer venue is that the forum selection

4    clause so requires.  In other words, Defendant never contends that venue is improper in this

5    District pursuant to Section 1391, and indeed, venue appears to lie here as "a substantial part of

6    the events . . . giving rise to the claim occurred" in the Northern District of California and

7    Defendant did business in this District.  28 U.S.C. § 1391(b)(2), (c).  Thus, dismissal or transfer

8    for improper venue is not required under Rule 12(b)(3) or Section 1406(a).

9          B.    Analysis

10         Defendant insists that the credit applications that T&M completed in February and October

11   2013 are the governing sales contract between the two parties, and the Terms attached to both of

12   these applications contain a broad forum selection clause requiring all litigation between them

13   stemming from their business relationship to occur in Dallas County, Texas.  (Dkt. No. 19 at 9; *see*

14   *also* Dkt. No. 20 at Ex. D.)  T&M, for its part, argues (1) that the credit applications are not

15   contracts that govern the parties' behavior and therefore do not apply here (2) and even if they

16   were, the forum selection clause Defendant identifies was not part of their applications, so it does

17   not apply.  (*See* Dkt. No. 28 at 6-8; Dkt. No. 42 at 3-4.)  Moreover, T&M argues that even if the

18   Terms apply such that there is a valid forum selection clause, exceptional circumstances make

19   transfer to the Northern District of Texas inappropriate.  (*See* Dkt. No. 42 at 5-6.)  Upon review of

20   the parties' materials and based on the arguments made at the hearing, the Court concludes that

21   there are genuine questions of material fact regarding the existence and enforceability of a forum

22   selection clause that requires an evidentiary hearing.  *See Petersen v. Boeing Co.*, 715 F.3d 276,

23   283 (9th Cir. 2013) (remanding to district court to conduct an evidentiary hearing on whether a

24   forum selection clause is enforceable).

25         As a threshold matter, the parties dispute whether any venue-related provision in T&M's

26   credit application can be considered a binding contract governing sales between the parties.  But

27   the plain language of both clauses the parties identify—the Texas forum selection clause that

28

United States District Court
Northern District of California

14

Defendant argues governs and the point-of-sale provision that T&M identifies—both clearly state that their terms apply to any suits arising out of the entire account or the parties' business relationship.   (*See* Dkt. No. 20 at Ex. D; Dkt. No. 42 at 4.)

For similar reasons, T&M's argument that the Terms are not a contractual agreement, but merely an application to do business with Defendant, also fails.  (*See* Dkt. No. 28 at 6.)  In support of this proposition, T&M emphasizes that "[w]hen Plaintiff submitted the credit application, [it was] not entering into a contract with Defendant, rather [it was] merely seeking credit approval to *potentially* do business with Defendant in the future."  (Dkt. No. 28 at 6; *see also* Dkt. No. 29 at 3 ("[I]t was our understanding that the credit application was just a formality[.]").)  However, T&M concedes that its representative, Takayuki Yoshihama, signed the credit applications.  (Dkt. No. 29 at 3.)  And the front page of the application, just above Yoshihama's signature, states that "Purchaser agrees that all Terms and Conditions of Sale, reverse side of the Credit Application . . . shall apply to all sales and extensions of credit made to Purchaser by Seller."  (*See* Dkt. No. 20 at Exs. A & C.)  Thus, even drawing all inferences in T&M's favor, any terms actually agreed to in connection with the credit applications would apply to the claims in the FAC given that they arise out of T&M's account with Defendant and out of the parties' business relationship.  The question here is which Terms were part of the agreement between the parties.

As the record currently stands, there are genuine factual issues about which Terms, if any, applied.  Defendant's custodian of records, Engebretsen, states in no uncertain terms that both of T&M's credit applications—the February 2013 and October 2013—included the Terms containing the forum selection clause at issue here.  (Dkt. No. ¶ 7.)  Engebretsen explains the inconsistency between the two sets of Terms in the record:  while Defendant previously used the point-of-sale terms that Mattson identifies, Defendant changed its terms and adopted the forum selection clause provision as of January 13, 2012.  (Dkt. No. 32 ¶¶ 4-6.)  For that reason, Engebretsen concludes, the forum selection clause terms must be applicable to the applications that T&M signed.  (*Id.* ¶ 6.)

United States District Court
Northern District of California

But T&M has provided evidence of its own to dispute that contention:  the declarations of Mattson and Quinn.  (Dkt. Nos. 29, 42-1, 44.)  Both individuals state with certainty that the actual credit applications between T&M and Defendant did not include the Texas forum selection clause.  (Dkt. No. 42-1 at 1-2; Dkt. No. 44 ¶ 4.)  While Mattson spoke second-hand about the credit application that his colleague, Yoshihama, signed (*see* Dkt. Nos. 29, 42-1), Quinn states that he was the person who signed both credit applications on Defendant's behalf and therefore has personal knowledge about the particular document used.  (Dkt. No. 44 ¶ 3.)

The Court is hard-pressed to understand how Mattson and T&M ended up with a copy of Defendant's point-of-sale terms if they were never included in the parties' agreement; nevertheless, Engebretsen's declaration that the forum selection clause was included in both agreements presents a genuine factual dispute.  Notably, neither party has offered the original, signed agreement as evidence.  At the hearing, Defendant asserted that it was still searching for such a "wet" copy of the agreement and and requested 30 days to conduct further investigation to determine, in good faith, what Terms were actually included as part of T&M's credit applications.

It is well established in the Ninth Circuit that, in deciding a Rule 12(b)(3) motion to dismiss, courts are permitted to hold an evidentiary hearing to resolve factual disputes about the existence or enforceability of forum selection clauses.  *See Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004).  Although *Atlantic Marine* makes clear that Rule 12(b)(3) is not the proper mechanism for resolving venue motions based on a forum selection clause, and although the Ninth Circuit has not yet addressed whether an evidentiary hearing remains appropriate to resolve factual disputes in the *Atlantic Marine* context, the Court sees no reason why *Atlantic Marine* would strip it of discretion to hold an evidentiary hearing where, as here, factual disputes prevent the court from determining whether there is a forum selection clause at play in the first instance, and indeed, other courts have done so.  *See Martinez v. Bloomberg LP*, 740 F.3d 211, 216-17 (2d Cir. 2014) (noting that, after *Atlantic Marine*, in deciding a motion to dismiss for *forum non conveniens* based on a forum selection clause, the court may rely on the

pleadings and affidavits or conduct an evidentiary hearing to resolve disputed factual questions); *see also Allianz Global Corp. & Specialty v. Chiswick Bridge*, No. 13-cv-7559-RA, 13-cv-7565-RA, 2014 WL 6469027, at *2 (S.D.N.Y. Nov. 17, 2014) (same).  At the hearing, the parties agreed that an evidentiary hearing is the proper next step under the circumstances presented.

Accordingly, in light of the genuine disputes of material fact regarding whether particular Terms and Conditions of Sale were included in T&M's credit applications, the Court cannot determine whether the forum selection clause that Defendant identifies here governed the parties' transactions on the basis of the parties' conflicting declarations and, instead, will hold an evidentiary hearing on the matter.  If, upon further investigation, it appears to Defendant that no hearing is warranted, the parties may file a stipulation on venue or Defendant is free to withdraw its motion.  If a party wishes to present live testimony at the hearing, it may do so; a party may also choose to rely on affidavits.

## B.     Sufficiency of Claims

Defendant next argues that the second through fourth causes of action—in other words, all but T&M's breach of contract claim—must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  As the sufficiency of the claims argument goes to the claims of *both* T&M *and* the Individual Plaintiffs—whose claims are not subject to any potential forum selection clause because they were not parties to the credit application—the Court will address these arguments now.[5]

A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facial plausibility standard is not a "probability

---

[5] At the hearing on this motion, the parties agreed that the Court's determinations about the sufficiency of the claims should govern all of the Plaintiffs' claims—not just those of the Individual Plaintiffs not subject to the potential forum selection clause—notwithstanding the pending venue motion.  Given that the forum selection clause does not pose a jurisdictional bar but rather a venue question, and in light of the spirit of judicial economy and efficiency of resolution, the Court agrees that this approach is appropriate.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the court "accept [s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citations omitted); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").

Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), under which a party is only required to make "a short and plain statement of the claim showing that the pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."). The court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64.

B.     Analysis

1.     *Breach of Implied Contract*

Plaintiffs' second cause of action alleges that Defendant breached implied contracts with

18

both T&M and the Individual Plaintiffs.  Under California law, "[a] contract is either express or implied."  *Retired Emps. Ass'n of Orange Cnty., Inc. v. Cnty. of Orange*, 52 Cal. 4th 1171, 1178 (2011) (citing Cal. Civ Code § 1619).  The elements of stating a claim for breach of an express or implied contract are the same.  *See Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 525 (2009). Both causes of action require the plaintiff to allege facts sufficient to plausibly establish:  (1) the existence of a contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages.  *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001).   The difference is that "[t]he existence and terms of an express contract are stated in words[,]" whereas "[t]he existence and terms of an implied contract are manifested by conduct. *Id.* (citing Cal. Civ. Code §§ 1620, 1621).  An express contract may be written or oral, but an oral contract claim is different from an implied contract claim.  *Davoodi v. Imani*, No. C 11-0260 SBA, 2011 WL 250392, at *3 (N.D. Cal. Jan. 26, 2011) ("An oral contract claim is based on oral representations, while an implied contract claim is predicated on the promisor's conduct.").  A contract implied in fact "consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words."  *Id.* (internal quotation marks and citation omitted).  In other words, there is no cause of action for implied contract "where there exists between the parties a valid express contract covering the same subject matter."  *Rutherford Holdings, LLC v. Plaza Del Ray*, 223 Cal. App. 4th 221, 231 (2014).

Here, Plaintiffs allege that they had implied contracts with Defendant "based upon a mutual understanding and expectations between the two parties that Defendant would provide [home and commercial systems] that would pass the NEC requirements and operate as designed, advertised, and sold."  (Dkt. No. 16 ¶ 41.)  Plaintiffs further clarify that this agreement was based on Defendant's representatives' *assurances* "that the systems would work and be able to be installed and operate in the state of California without any issues."  (*Id.* ¶ 42.)   In addition, Plaintiffs allege that Defendant and the Newberrys also had an implied contract with Defendant based on Defendant's "assurances to [the Individual Plaintiffs] that they would be compensated

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

for their losses and that [Defendant] would correct the issues with the product so that they could function properly and pursuant to the National Electric Code requirements in the State of California." (*Id.* ¶ 45.)

Here, the implied contract between T&M and Defendant is the same as the one identified in T&M's first cause of action for breach of contract:  both allege that Defendant breached its agreement to provide systems that were National Electric Code-compliant and operable through an HVAC system in the state of California.  T&M cannot prevail on claims for breaching an express and implied contract for the same subject matter.  *See Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (1975) (citation omitted) ("There cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time.").  While a plaintiff may plead the two theories in the alternative, *see* Fed. R. Civ. P. 8, T&M has not done so here. *See, e.g., Rankin v. Global Tel*Link Corp.*, No. 13-cv-0117-JCS, 2013 WL 3456949, at *13 (July 9, 2013).

Moreover, this cause of action otherwise fails to state a claim upon which relief may be granted for both T&M and the Individual Plaintiffs for another reason: as written, it is pled as a breach of oral contract rather than of an implied contract.  The FAC's allegations are all based on statements and assurances that Defendant and its representatives made to T&M and the Individual Plaintiffs before they purchased the systems.  (*See, e.g.*, Dkt. No. 16 ¶¶ 41-45.)  For example, the FAC repeatedly alleges that Defendant assured T&M and the individual Plaintiffs in conversations and presentations that the systems would function properly, that they were National Electric Code compliant, and that if they did not work, Defendant would be responsible for fixing it.  (*See, e.g.*, Dkt. No. 16 ¶¶ 18, 22, 20, 25.)  Thus, the breach of implied contract cause of action is dismissed to the extent that it is based on these allegations, because they allege breach of promises that Defendant made orally to Plaintiffs, who have identified the particular statements in the FAC, but have not identified conduct that further separately implied intent to be bound by such an agreement.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Likewise, the Individual Plaintiffs' implied contract cause of action based on Defendant's conduct and actions *after* it discovered that the systems were inoperable is similarly based on actual statements.  Plaintiffs allege that Defendant "expressly [ensured] that . . . they would cause [the solar panel systems they told to Plaintiffs] to be repaired in a timely and appropriate manner[,]" and "made . . . representations that they would reimburse the Plaintiffs for the product or cause it to operate as promised and cause it to pass the NEC requirements."  (Dkt. No. 16 ¶¶ 59, 64.)  Despite those representations, the FAC alleges that Defendant neither caused the systems to be National Electric Code-compliant and operable nor compensated Plaintiffs for the cost.  Thus, this alleged breach is based not on conduct that implies intent to be bound, but on actual representations that Defendant made using words.  That these assurances were not written does not turn this into an implied agreement, but rather an oral agreement.  *See Davoodi*, 2011 WL 250392, at *3.  While Plaintiffs attempt to characterize the claim as based on Defendant's conduct and actions in sending representatives to meet with the prospective buyers, Plaintiffs' argument belies itself,  insofar as they note that the representatives were sent "to solicit a product *they assured* the Plaintiff would operate successful[ly] and in accordance with all California Laws including the NEC[.]" (Dkt. No. 27 at 10-22.)

Thus, Plaintiffs' second cause of action for breach of implied contract is dismissed with leave to amend, either to add allegations regarding conduct to state a claim for implied contract, to re-frame these claims as breach of an oral agreement, or both.

### 2. *Breach of Warranties*

Plaintiffs' third cause of action alleges breach of warranties—specifically, express warranties about the systems and the implied warranties of fitness for a particular purpose and merchantability.[6]  (Dkt. No. 16 ¶¶ 51-56.)  Defendant contends that all breach of warranty claims

---

[6] Plaintiffs do not specify under which law they bring their breach of warranties claim.  (*See* Dkt. No. 16 ¶¶ 51-56.)  In California, a plaintiff alleging breach of warranties may bring suit under the California Commercial Code § 2314, the Song-Beverly Act, Cal. Civ. Code § 1791, or the Magnuson-Moss Act, 15 U.S.C. § 2301.  The Song-Beverly Act applies only to goods sold in California, Cal. Civ. Code § 1792, which the FAC appears to allege here.  However, because the

21

United States District Court
Northern District of California

must be dismissed for various reasons.  (*See* Dkt. No. 19 at 15-17; Dkt. No. 23 at 11-15.)

a.      Privity

Defendant first contends that the Individual Plaintiffs cannot bring any breach of warranty

claims (whether express or implied) because they did not purchase the systems directly from

Defendant, but rather from T&M, and therefore were not in privity with Defendant.  (Dkt. No. 23

at 11.)  "Under California law, the general rule is that privity of contract is required in an action

for breach of either express or implied warranty and that there is no privity between the original

seller and a subsequent purchaser who is in no way a party to the original sale."[7]  *In re Clorox*

*Consumer Litig.*, 894 F. Supp. 2d 1224, 1236 (N.D. Cal. 2012) (internal quotation marks omitted)

(citing *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 695 (1954)).  "A buyer and a seller stand in

privity if they are in adjoining links of the distribution chain"; "[t]hus, an end consumer . . . who

buys from a retailer is not in privity with the manufacturer."  *Clemens v. DaimlerChrysler Corp.*,

534 F.3d 1017, 1023 (9th Cir. 2008) (citing *Osborne v. Subaru of Am. Inc.*, 198 Cal. App. 3d 646,

656 n.6 (1988)).  There are "particularized exceptions" to this privity requirement, such as "when

the plaintiff relies on written labels or advertisements of a manufacturer" or "in special cases

involving foodstuffs, pesticides, and pharmaceuticals, [ ] where the end user is an employee of the

purchaser[,]" *id.* (citations omitted), or in cases involving inherently dangerous instrumentalities,

such as guns, *see Chavez v. Glock, Inc.*, 207 Cal. App. 4th 1283, 1315 (2012).  And while other

courts have relaxed the privity requirement, it remains the law in California.  *Id.* at 1024 (citations

---

Song-Beverly Act and Magnuson-Moss Act both require the court to apply state warranty law, the
court construes Plaintiffs' claims as arising under Section 2314.  *See Birdsong v. Apple, Inc.*, 590
F.3d 955, 958 n.2 (9th Cir. 2009) (citations omitted).

[7] The lack of clarity about under what law Plaintiffs bring their breach of warranty claims is also
problematic here, as courts have found that no privity is required for breach of express or implied
warranty claims under the Song-Beverly Act.  *See Keegan v. Am. Honda Motor Co.*, 838 F. Supp.
2d 929, 946-67 (C.D. Cal. 2012) (collecting cases holding that the Song-Beverly Act does not
impose a vertical privity requirement).  However, when the act is not mentioned, courts tend to
read warranty claims as arising under the California Commercial Code instead.  *See, e.g.*, *Clark v.
LG Elecs. U.S.A., Inc.*, No. 13-cv-485 JM (JMA), 2013 WL 5816410, at *10 (S.D. Cal. Oct. 29,
2013).

omitted).  Taking the allegations in the FAC as true, however, the Individual Plaintiffs have sufficiently alleged that either they were in privity with Defendant or that the reliance exception applies.  The Individual Plaintiffs have alleged that they were in vertical privity with Defendant based on their understanding that Defendant and T&M were a partnership and thus purchasing from T&M was the equivalent of purchasing from Defendant.  (*See, e.g.*, Dkt. No. 16 ¶¶ 21-22 (noting that the Chans authorized T&M to purchase the commercial solar panel system after Martinez represented to them that T&M and Defendant had a partnership and Defendant would be responsible for the product).)  Plaintiffs ultimately may not be able to prove such privity; however, it is sufficiently alleged at this stage of the litigation.  Moreover, even if the Individual Plaintiffs were not in vertical privity with Defendant, the FAC sufficiently alleges that the Individual Plaintiffs relied on Defendant's presentation about the system and on Defendant's written form that indicated that the systems would be approved and meet all National Electric Code requirements.  (*See, e.g.*, Dkt. No. 16 ¶ 54.)  For each of these reasons, the Individual Plaintiffs' breach of warranty claims against Defendant are actionable—provided that they are sufficiently pled.

b.      Express Warranties

California Commercial Code § 2313, which defines the term "express warranty," applies to "transactions in goods."  *See* Cal. Comm. Code § 2102; *see also* Cal. Civ. Code § 1791.2(a)(1) (defining "express warranty" as "[a] *written statement* arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or retailer undertakes to preserve or maintain the utility or performance of the consumer good or to provide compensation if there is a failure in utility or performance.").  "An express warranty is a term of the parties' contract."  *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 978 (C.D. Cal. 2014) (citation omitted).  To state a claim for breach of express warranty under California law, a plaintiff must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury.  *Minkler v. Apple, Inc.*, --- F. Supp. 2d ----,

No. 5:13-CV-05332-EJD, 2014 WL 4100613, at *3 (N.D. Cal. Aug. 20, 2014) (citing *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (1986)); *see also Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (2010) (explaining that to state a claim for breach of express warranty, a plaintiff must allege that the defendant's statements constituted an affirmation of fact or promise or a description of the goods).  In addition, the Plaintiff must allege that he has given pre-suit notice to the defendant of the alleged breach of warranty to allow the defendant an opportunity to cure the defect outside of court.  *See Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011); *Cardinal Health 301 v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 115, 135 (2008).

To allege facts identifying the exact terms of the warranty, a plaintiff must provide "specifics" about what the warranty statement was, and how and when it was breached.  *See Minkler*, --- F. Supp. 2d ----, 2014 WL 4100613, at *3.  To constitute an actionable express warranty, the statement "must be specific and unequivocal[,]" *Johnson v. Mitsubishi Digital Elecs. Am., Inc.*, 578 F. Supp. 2d 1229, 1236 (C.D. Cal. 2008), and it must be written.  Cal. Civ. Code § 1791.2(a); *Maneely v. Gen. Motors Corp.*, 108 F.3d 1176, 1181 (9th Cir. 1997) (the plaintiff must identify a "specific and unequivocal written statement" about the product that constitutes an "explicit guarantee"); *see also Long v. Graco Children's Prods., Inc.*, No. 13-cv-01257-WHO, 2013 WL 4655763, at *10 (N.D. Cal. Aug. 26, 2013). Certain statements, however, cannot serve as the basis of an express warranty.  For example, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Smith v. LG Elecs U.S.A., Inc.*, No. C 13-4361 PJH, 2014 WL 989742, at *4 (N.D. Cal. Mar. 11, 2014) (citing Cal. Comm. Code § 2313 and Cal. Civ. Code § 1791.2(a)(2)(b)). Rather, such statements are mere puffery that do not support liability under a claim of breach of warranty.  *See Long*, 2013 WL 4655763, at *11.

Here, Plaintiffs contend that a number of statements serve as Defendant's express warranties about the solar panel systems:  (1) Defendant's representations to T&M and during presentations to the Individual Plaintiffs that "the systems would not have any issues, that

[Defendant] stood by their product 100%[,] and that if there were any issues that [Defendant] would take full responsibility"; and (2) that Defendant "listed the [solar panel system] equipment as being approved and meeting all [National Electric Code] requirements" in the individualized inspection form it provided to T&M and the Individual Plaintiffs.  (Dkt. No. 16 ¶ 54.)  The first statements cannot serve as the basis for an express warranty because the FAC does not allege that the statements were written.  *See* Cal. Civ. Code § 1791.2(a); *Long*, 2013 WL 4655763, at *11. And even if they were, they are too vague to serve as express warranties.  But the second statement in the inspection form that the solar panel systems equipment would comply with the National Electric Code is both written and sufficiently specific to serve as a written warranty, and thus the first element of a breach of express warranty is satisfied solely as to this statement.

To satisfy the second element, a plaintiff must allege facts sufficient to plausibly establish that the defendant's statement formed the "basis of the bargain," by alleging "facts showing that [plaintiff] was exposed to the alleged statement prior to making the decision to purchase the product."  *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 988 (N.D. Cal. 2009).  Here, Plaintiffs have alleged that they viewed the inspection form and that they relied on the statement in the form when choosing to purchase solar panel systems from Defendant.  (Dkt. No. 16 ¶¶ 22, 54.)  These facts are sufficient to plead this element.

Finally, Plaintiffs have pleaded facts sufficient to plausibly establish the final element—breach of the express warranty that proximately caused their injury.  *Minkler*, --- F. Supp. 2d ----, 2014 WL 4100613, at *3.  According to the FAC, because the solar panel systems they purchased from Defendant did not pass National Electric Code requirements contrary to Defendant's clear statement to the contrary, Plaintiffs could not use the systems, and therefore spent significant amounts of money both on products that they cannot use and on improvements to their property to make way for those products.  (*See* Dkt. No. 16 ¶¶ 20, 25, 29, 55.)  Accordingly, all Plaintiffs may proceed on their breach of express warranty claim based solely on the statement in Defendant's inspection form that the solar panel equipment that would be sold to be installed at the Individual

Plaintiffs' property would pass National Electric Code requirements.

c.     Implied Warranty of Fitness for a Particular Purpose

Plaintiffs also allege that Defendant breached the implied warranty of fitness for a particular purpose.  (Dkt. No. 16 ¶ 52.)  "Unlike express warranties, which are contractual in nature, [implied warranties] arise[ ] by operation of law[,]" and, unless specifically disclaimed, "accompanies every retail sale of consumer goods." *Viggiano v. Hansen Natural Corp.*, 944 F. Supp. 2d 877, 895096 (C.D. Cal. 2013) (citations omitted).   To state a claim for breach of this implied warranty, a plaintiff must allege "(1) the purchaser at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time of contracting has reason to know of this particular purpose, (3) the buyer relies on the seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the time of contracting has reason to know that the buyer is relying on such skill and judgment." *Frenzel v. AliphCom*, ---F. Supp. 3d ----, No 14-cv-03587-WHO, 2014 WL 7387150, at *16 (N.D. Cal. Dec. 29, 2014) (citing *Keith v. Buchanan*, 173 Cal. App. 3d 13, 25 (1985)).

"A particular purpose differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." *Am. Suzuki Motor Corp. v. Sup. Ct.*, 37 Cal. App. 4th 1291, 1295 n.2 (1995) (internal quotation marks omitted).  "To state a claim for breach of the implied warranty of particular purpose, the plaintiff must identify a particular purpose for which he obtained the product at issue." *Frenzel*, --- F. Supp. 3d ----, 2014 WL 7387150, at *16 (citations omitted); *see, e.g.*, *id.* (dismissing plaintiff's breach of implied warranty of particular purpose claim where the complaint only alleged that the plaintiff intended to use the product for its ordinary use); *Smith*, 2014 WL 989742, at *8 ("[P]laintiff has identified no particular purpose for which she purchased the washing machine. She purchased it to wash her laundry, which is the ordinary purpose of a washing machine."

(internal quotation marks omitted)); *Kent v. Hewlett-Packard Co.*, No. 09-cv-05341-JF, 2010 WL 2681767, at *5 (N.D. Cal. July 6, 2010) ("Plaintiffs have not alleged that they used the computers . . . for anything other than their ordinary purpose.  Thus, plaintiffs have not stated a claim for breach of an implied warranty for a particular purpose.").

Here, Plaintiffs contend that they have alleged facts that plausibly establish that they purchased the solar panel systems from Defendant for a "particular purpose" under the meaning of the law—specifically, that they purchased the systems "to be installed and operate in the state of California through the air conditioner[,]" and that "each of the 6 clients systems T&M ordered from Defendant needed to be specific to their location.  (Dkt. No. 28 at 13-14.)  The problem with this argument is that Plaintiffs also allege that this was the very purpose that Defendant marketed and sold the solar panel systems.  (*See, e.g.*, Dkt. No. 16 ¶ 9 ("Plaintiff T&M ordered and purchased these systems through Defendant Lennox because unlike traditional solar panel systems, these systems are created to run electrical systems through the air conditioner instead of through the electrical panel.").)  That Defendant was involved in selecting the particular equipment for each customer does not change the analysis; instead, each customer intended to use the system—comprised of whatever equipment Defendant advised—for the ordinary purpose for which Defendant's systems are customarily purchased:  as solar panel systems that operate through an HVAC system instead of an electrical panel.  Accordingly, Plaintiffs' claims for breach of the implied warranty of fitness for a particular purpose are dismissed with leave to amend.

d.      Implied Warranty of Merchantability

Plaintiffs also contend that Defendant breached the implied warranty of merchantability.  The implied warranty of merchantability does not "impose a general requirement that goods precisely fulfill the expectation of the buyer.  Instead, it provides for a minimum level of quality." *Am. Suzuki Motor Corp.*, 37 Cal. App. 4th at 1296 (internal quotation marks and citation omitted).  Instead, to state a claim for breach of the implied warranty of merchantability, a plaintiff must allege a "fundamental defect that renders the product unfit for its ordinary purpose." *Tietsworth v.*

*Sears*, 720 F. Supp. 2d 1123, 1142 (N.D. Cal. 2010); *see also Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1303 (2009) ("The core test of merchantability is fitness for the ordinary purpose for which such goods are used." (citation omitted)).  "Such fitness is shown if the product is in safe condition and substantially free of defects[.]"  *Id.* (internal quotation marks and citation omitted).  In other words, a plaintiff claiming breach of an implied warranty of merchantability must show that the product "did not possess even the most basic degree of fitness for ordinary use[,]" *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (2003), or their "intended use." *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *7 (N.D. Cal. June 5, 2009).

For example, in cases where plaintiffs allege breach of the implied warranty of merchantability based on an improperly functioning feature of a car they purchased, courts have held that the implied warranty "is simply a guarantee that [the car] will operate in a safe condition and substantially free of defects.  Thus, where a car can provide safe, reliable transportation, it is generally considered merchantable" even if certain functions of the car—like a navigation or entertainment system—do not operate as promised.  *See In re MyFord Touch Consumer Litig.*, --- F. Supp. 3d ----, No. C-13-3072 EMC, 2014 WL 2451291, at *27-28 (N.D. Cal. May 30, 2014) (citing *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989)).

Here, Plaintiffs allege that the ordinary and intended use of the solar panel systems they purchased from Defendant was use as a solar panel system installed through HVAC systems instead of through electrical panels.  Plaintiffs further allege that because the solar panel systems could not pass the National Electric Code requirements, they could not be installed through the HVAC systems as promised, and therefore could not be installed and operated for Plaintiffs.  Because the product could not be installed or operate as it was intended to, Plaintiffs contend that the systems were defective.  (*See, e.g.*, Dkt. No. 27 at 16.)  As the FAC allegations establish that the ordinary and intended purpose of the systems was just that—to function as solar panel systems through customer's air conditioning systems instead of through the electrical panel, and the FAC alleges that the systems altogether failed to do so, Plaintiffs have sufficiently pleaded breach of the

implied warranty of merchantability.

Defendant insists that the solar panel systems Plaintiffs purchased were still merchantable because, as the FAC alleges, they "work[ but] cannot be used" due to failure to comply with the National Electric Code, and can still operate as a functioning solar panel system through an electrical panel, just like traditional solar panel systems.  (Dkt. No. 30 at 12; *see also* Dkt. No. 16 ¶ 14; *id.* ¶ 55 (alleging that the system "could not be installed or function as promised").)  The Court is unpersuaded.  According to the FAC's allegations, Plaintiffs could not use the systems through an electrical panel without making changes and upgrades to their property.  (*See, e.g.*, Dkt. No. 16 ¶ 20.)  Thus, Plaintiffs have sufficiently alleged that the panels could not operate in the "traditional" manner as delivered and were therefore defective.  For all of the above reasons, Plaintiffs have stated a claim for breach of the implied warranty of merchantability.

### 3.   *Fraud*

Plaintiffs' final cause of action alleges fraud.  The basis of this cause of action is Plaintiffs' claim that Defendant represented that the systems would operate properly pursuant to the National Electric Code, that another business was already using the systems in Sacramento, and that Defendant would reimburse Plaintiff for the product or otherwise make changes to bring it into National Electric Code compliance, but these statements were all intentionally false.  (*See* Dkt. No. 16 ¶¶ 57-67.)  Defendant contends that Plaintiffs' fraud claim is not actionable under the "economic loss" rule, and that the claim otherwise fails to state a claim because it is not pleaded with particularity.

### a.   Heightened Pleading Standard

Rule 9(b) states:  "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9.  Thus, the Ninth Circuit has held that, "while a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

of the fraud must be stated with particularity is a federally imposed rule." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

With respect to "the who," "Rule 9(b) requires fraud claims to be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged, so that they can defend against the charge and not just deny that they have done anything wrong." *Cardenas v. NBTY, Inc.*, 870 F. Supp. 2d 984, 990 (E.D. Cal. 2012) (internal citation omitted). This requires stating with particularity "the identities of the parties to the misrepresentations." *Kennedy v. World Alliance Fin. Corp.*, 792 F. Supp. 2d 1103, 1106 (E.D. Cal. 2011).  Moreover, when the complaint highlights a particular statement as false, it must also "set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994).  Notably, to qualify as a misrepresentation, the complaint must allege facts sufficient to plausibly establish that the statement was false when made. *Id.*; *see also Richardson v. Reliance Nat'l Indem. Co.*, No. C-99-2952-CRB, 2000 WL 284211, at *4 (N.D. Cal. Mar. 9, 2000).  Mere conclusory allegations of the statement's falseness are insufficient. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1548.

Here, the fraud claim fails to meet the strictures that Rule 9(b) prescribes; while some of the pleading requirements have been met, others fall short.  With respect to the "what," Plaintiff identifies the misrepresentations as including the following statements:

> Defendant promised the system would function and operate the Plaintiff's locations as promised; Defendant promised the system met all [National Electric Code] requirements and was entirely legal; Defendant claimed that a business in Sacramento was successfully using the system; Defendant promised to take full responsibility for the systems if they failed and Defendant provided some of Plaintiff's clients with monetary reimbursement and not others[;] Defendant lied to Plaintiff on multiple occasions and they lied about the heart of their business with Plaintiff—the main purpose of the systems and of Plaintiff doing business with [D]efendant turned out to be based entirely on lies by Defendant.

1

2

3    (Dkt. No. 28 at 18; Dkt. No. 27 at 20.)  Thus, the FAC certainly identifies particular false

4    statements.  But with the exception of statements made at presentations for the Newberrys and the

5    Chans, the FAC is devoid of facts indicating whether the statements were made in person, in

     writing, on the telephone, in email, or in some other manner.  The "how" is therefore wanting.

6
            With respect to the "who," Plaintiffs have attributed some statements to particular
7
     employees of Defendant—in particular, Peter Martinez and Stu Quinn (*see, e.g.*, Dkt. No. 16 ¶ 18
8
     (Peter Martinez guaranteed the product's success to the Newberrys and represented that Defendant
9
     would be responsible if it failed)), but others simply refer to Defendant generally (*see, e.g.*, *id.*
10
     ¶ 11 ("Defendant Lennox made multiple representations to Plaintiff T&M assuring that the
11
     systems would operate as advertised and pass the NEC requirements . . . [and] that a company in
12
     Sacramento, California was operating with these Systems in place.")), which does not comply
13
     with Rule 9(b).  *See Cardenas*, 870 F. Supp. 2d at 990 (internal citation omitted); *Kennedy*, 792 F.
14
     Supp. 2d at 1106.  Likewise, the "where"—the location where the statements were made—is
15
     present for some statements but entirely lacking for others.  (*Compare* Dkt. No. 16 ¶ 18 (when
16
     traveling to the Newberrys' home in Brentwood, California, Martinez told them the system could
17
     be installed and guaranteed its success), *with id.* ¶ 11 ("Defendant Lennox told Plaintiff T&M that
18
     a company in Sacramento, California was operating with these systems in place.").)  In fact, the
19
     FAC lacks facts alleging where T&M and Defendant engaged in negotiations or other business
20
     dealings.[8]  Most notably, in their oppositions Plaintiffs do not even attempt to argue that they have
21
     sufficiently pleaded the "when" of the alleged fraudulent statements.  Indeed, the only mention of
22
     timing that occurs anywhere in the FAC is that representatives of Defendant began working with
23
     T&M in July of 2013.  (Dkt. No. 16 ¶ 9.)  Plaintiffs' fraud claim cannot proceed without alleging
24
     facts pertaining to the timing of the particular representations.  Similarly, although a defendant's
25

26   _____

27   [8] While the Mattson Declaration, submitted in support of T&M's opposition to Defendant's
     motion to dismiss, contains additional facts regarding the parties' business dealings and the
     locations of alleged misrepresentations, the Court does not consider new facts alleged in a
28   plaintiff's opposition to a defendant's motion to dismiss.  *See Broam v. Bogan*, 320 F.2d 1023,
     1026 (9th Cir. 2003) (citation omitted).

United States District Court
Northern District of California

1

2       intent and knowledge need only be pleaded generally, *see Senah, Inc. v. Xi'an Forstar S&T Co.*,

3       No. 13-cv-04252-BLF, 2014 WL 6065895, at *2 (N.D. Cal. Nov. 12, 2014), the FAC alleges them

4       generally with respect to certain alleged misrepresentations, but they are absent for others.  For

5       example, Plaintiffs have alleged knowledge of falsity at the time the statement was made with

6       respect to the National Electric Code requirement statement.  (Dkt. No. 16 ¶ 13 ("Defendant . . .

7       knew or should have known that [their systems] would fail to pass the NEC standards test.").)

8       But there are neither conclusory allegations nor facts from which an inference of falsity *when*

9       *made* can be drawn regarding Defendant's alleged statement that another company in Sacramento

10      was using Defendants' systems, or that Defendant would reimburse Plaintiffs for the product or

11      cause it to operate functionally.  The mere allegation that these representations "turned out to be

12      fraudulent and false" is not enough.  (Dkt. No. 16 ¶ 62.)  *See In re GlenFed, Inc. Sec. Litig.*, 42

13      F.3d at 1548; *Richardson*, 2000 WL 284211, at *4.

14              In short, as written, the facts alleged fail to pass muster under the heightened pleading

15      requirements of Rule 9(b).  Having determined that the FAC fails to state a claim for fraud, the

16      Court will not address in the abstract Defendant's argument that a claim may be barred by the

17      economic loss rule.  Should Plaintiffs sufficiently amend their fraud claim, the Court will take up

18      this argument at that time.

19                                              **CONCLUSION**

20              For the reasons described above, the Court concludes that genuine disputes of material fact

21      prevent it from making a determination about the existence of a forum selection clause, and thus

22      the Court cannot decide Defendant's venue motion without an evidentiary hearing.  The Court

23      therefore sets an evidentiary hearing for April 16, 2015 at 2:00 p.m., unless, upon further

24      investigation, the parties file a stipulation on venue or Defendant withdraws its motion.  If the

25      evidentiary hearing occurs, the parties shall produce to each other all relevant documents in

26      advance of the hearing.

27              In addition, the Court GRANTS IN PART and DENIES IN PART Defendant's 12(b)(6)

28

*United States District Court*
*Northern District of California*

motions.  Specifically, Plaintiffs' claims for breach of implied contract, breach of the implied warranty of fitness for a particular purpose, and fraud are dismissed without prejudice for failure to state a claim.  The breach of express warranty may only proceed based on the statements in Defendant's written materials.  Plaintiffs shall have leave to file a second amended complaint by April 20, 2015.  Failure to file a second amended complaint may result in dismissal of these claims with prejudice.

In addition, the Case Management Conference previously set for April 23, 2015, is CONTINUED to May 28, 2015 at 1:30 p.m.

**IT IS SO ORDERED.**

Dated:  March 19, 2015

_____
Jacqueline Scott Corley
United States Magistrate Judge